602 So.2d 564 (1992)
STATE of Florida, DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Petitioner,
v.
The Honorable R. Grable STOUTAMIRE, Judge, Sixth Judicial Circuit in and for Pinellas County; the Honorable Hugh E. Starnes, Judge, Twentieth Judicial Circuit in and for Lee County; and Juanita Weston Maxwell, Respondents.
Nos. 91-03095, 91-03206 and 91-03321.
District Court of Appeal of Florida, Second District.
May 6, 1992.
*565 Barbara Ann Dell McPherson, St. Petersburg, for petitioner.
Robert H. Dillinger, St. Petersburg, for respondents.
PER CURIAM.
The Department of Health and Rehabilitative Services (hereafter HRS) petitions for a writ of prohibition and/or writ of certiorari barring the respondents from carrying out a judicially-mandated plan of treatment for a mentally ill defendant. Our analysis of the respondents' orders leads us to conclude that they involve neither an absence of subject matter jurisdiction nor a departure from the essential requirements of law. We therefore deny the petitions. We write primarily to emphasize that our holding is grounded in the very unusual facts of the present action, and should be construed narrowly and employed as precedent only with extreme caution.
In 1981, in Lee County, Juanita Weston Maxwell was acquitted of murder and robbery by reason of insanity. Maxwell was committed to the Florida State Hospital in Chattahoochee on August 7, 1981. Beginning in late 1986 she was permitted several leaves of absence, during which she returned to Lee County. Finally, on February 25, 1987, Maxwell was discharged from custody pursuant to a conditional release order. See § 916.17, Fla. Stat. (1991); Fla. R.Crim.P. 3.219.
Unfortunately this was not Maxwell's last contact with the criminal justice system. In 1988 she was arrested for robbery in Pinellas County. As a result of the new arrest, Judge Starnes, as the presiding judge in the Lee County case, entered an order revoking the 1987 conditional release order. See Fla.R.Crim.P. 3.219(b).[1] Maxwell spent the next two years in custody and, on at least one occasion, was committed to the state hospital as incompetent to stand trial. Eventually, however, she appeared before Judge Stoutamire and entered a plea of no contest to the Pinellas County robbery charge. Both judges then signed a joint order in April, 1991, directing HRS to "provide appropriate treatment in an appropriate treatment facility."
HRS moved for reconsideration of this order, submitting a detailed report which *566 recommended that Maxwell first be placed in the HRS-maintained South Florida Evaluation and Treatment Center. However, Judge Stoutamire, on September 16, 1991, entered a second order which instead requires HRS to provide Maxwell with private hospitalization and psychotherapy. On October 8 Judge Starnes adopted Stoutamire's order. It is from these orders that the HRS petitions are brought.[2]
From the voluminous documentation included with the petitions, it appears that all the experts hired or appointed to examine Maxwell generally agree she suffers from "Multiple Personality Disorder." Most also concede that this disorder is extremely difficult, perhaps impossible, to "cure." The forensic facilities normally used by HRS are said to have little experience in treating the disorder. The South Florida Evaluation and Treatment Center, located in Miami, did express an interest in Maxwell's case. The primary objection to this facility appears to be its distance from the community in which Maxwell now lives. There is one closer facility, Medfield Hospital, which purports to be equipped to treat Maxwell. It is, however, a private facility, and HRS objects that it cannot be ordered to pay for private treatment. It should be noted, however, that HRS apparently does use Medfield on occasion as a "Baker Act receiving facility." The circuit court found "an implicit and explicit acknowledgment by HRS as to their agreement for payment of the appropriate facilities and physicians."[3]
As we interpret the HRS petitions, their principal thrust is that a trial court lacks jurisdiction to tell the department what to do with patients once they have been placed in its custody. See State ex rel. Dept. of Health and Rehabilitative Services v. Sepe, 291 So.2d 108 (Fla. 3d DCA 1974). In Sepe the court entered a commitment order pursuant to Florida Rule of Criminal Procedure 3.210 (incompetency to stand trial). The court went considerably farther, also issuing specific directions as to the nature and duration of the treatment to be administered, even including the types of drugs the defendant was to be given. HRS successfully sought a writ of prohibition, contending that the judge had exceeded his jurisdiction and had violated constitutional provisions regarding separation of powers.
A more recent case is State, Dept. of Health and Rehabilitative Services v. Schreiber, 561 So.2d 1236 (Fla. 4th DCA 1990). Here a patient named Kathy Twyman was committed to an HRS facility known as the South Florida State Hospital (forensic unit) for reasons not specified in the opinion. When, in 1979, Twyman twice escaped, HRS executives were ordered to show cause why they should not be held in contempt for failure to perform their appointed duties (by "permitting" the escape). Public defenders for two counties moved to intervene on behalf of Twyman and all others "similarly situated," and the circuit court treated the motion as an omnibus petition for habeas corpus. The court stated its intention to conduct a broad inquiry into conditions and treatment patterns at the South Florida forensic unit. This resulted in several years' worth of periodic reports and the eventual phaseout of the facility. Some years later (1986) the South Florida Evaluation and Treatment Center[4] was opened for "patients with criminal court holds who require a secure unit" and who were ineligible for placement in the nearby South Florida State Hospital (which remained open without the forensic unit). In 1989 the circuit court entered a sua sponte order in the Twyman case, which apparently had remained in limbo despite *567 the fact Twyman had never been apprehended and was still at large. This order enjoined HRS from placing patients at South Florida State Hospital. The district court, citing Sepe, found that the circuit court lacked subject matter jurisdiction to conduct its generalized "judicial inquiry."
We decline to apply Sepe and Schreiber to the present case, for we find a specific source of legislative authorization affording at least one of the respondent judges the authority to intervene regarding appropriate placement for Maxwell. We further find no abuse of discretion in the steps taken by that judge in furtherance of this statutory responsibility.
Chapter 916, Florida Statutes, is entitled the "Forensic Client Services Act." § 916.105, Fla. Stat. (1991). Portions of this chapter might just as easily be dubbed a "mentally ill defendants' bill of rights." See particularly § 916.107, Fla. Stat. (1991). This chapter, whose last substantial revision occurred in 1985,[5] applies both to patients committed as incompetent to stand trial, and those acquitted of criminal charges by reason of insanity. § 916.106(4)(b), Fla. Stat. (1991). In subsection 916.107(4), the legislature has specifically dictated that "each patient committed pursuant to this chapter shall receive treatment suited to his needs," including "such medical, vocational, social, educational, and rehabilitative services as his condition requires to bring about an early return to his community." The legislature has also specified at least two methods for judicial implementation of these goals. Section 916.107(11), inapplicable here, authorizes a suit for damages against "[a]ny person who violates or abuses any rights or privileges of a patient provided by this act." Section 916.107(9) confers the right of a patient (extending to a guardian, representative, friend, and parties similarly situated) to petition for habeas corpus.
The decision in Sepe predates the adoption of Chapter 916. To the extent it can be interpreted as requiring courts to assume a "hands-off" posture once a patient is committed, we find Sepe to have been overruled by statute. Otherwise, both Sepe and Schreiber appear to involve efforts by circuit courts to interfere in the general operations of HRS, rather than the furtherance of statutorily mandated duties regarding individual patients, and so are factually distinguishable. Though Schreiber postdates Chapter 916, we construe that holding as requiring a specific "case or controversy" to trigger the provisions of Chapter 916.
Such a "controversy" now exists because evidence has come to light that Maxwell's needs are extraordinary in character and that the "normal" placement facilities such as Chattahoochee are inadequate. While Chapter 916 does not envision the precise (and rather unusual) procedural history of this case, we believe that these same deficiencies would have justified the filing of a petition for habeas corpus on Maxwell's behalf. Accordingly, we cannot say the Lee County Circuit Court  which already had subject matter jurisdiction over Maxwell by virtue of its prior adjudication of insanity[6]  acted outside the scope of its authority in utilizing supervisory powers afforded it by Chapter 916.
Having found the existence of statutory authority to oversee Maxwell's commitment status, we turn to the question whether the Pinellas County Circuit Court, in its order which the Lee County Circuit Court adopted, exceeded that authority by rejecting the HRS-maintained South Florida facility in favor of the private hospital closer to Maxwell's current place of residence. The circuit court had before it sufficient evidence to justify its conclusion that the only reasonable alternatives were Medfield and South Florida, because only these claimed experience or interest in *568 treating the Multiple Personality Disorder. We must assume the existence of some discretion on the part of the court in determining the extent of any individual Chapter 916 patient's "needs" and what constitutes "suitable" treatment. If so, the remedy fashioned by the court does not represent an abuse of discretion. The court relied upon advice from experts who appear to have operated with HRS approval. Valid reasons existed to select the private hospital over the option preferred by HRS  particularly if "early return to [the] community," the language at section 916.107(4), is a primary legislative objective  regardless how much weight is given to Maxwell's "estoppel" argument.
The question of Judge Stoutamire's authority is more troublesome. Maxwell was not adjudicated insane in the case before him, and she is no longer deemed incompetent to stand trial. Accordingly, because she is not now "committed to the department" in the Pinellas case, that case falls outside the purview of Chapter 916. Were this the only proceeding before us, we would find the HRS argument more persuasive. However, this case presents a curious hybrid wherein the conditions of one judge's probation overlap the specifics of another judge's involuntary commitment. From Maxwell's point of view this seeming inconsistency may be logical, but it is questionable whether the law should encourage someone to take mutually exclusive positions  in effect, to be "insane" only to the extent it benefits them. The lingering taint of the Lee County adjudication of insanity also raises questions about the voidability of the Pinellas judgment. However, because we are convinced that Judge Starnes could have acted in the same manner he did regardless of the eventual outcome of the Pinellas case, the order of commitment to Medfield Hospital is not fatally defective.
Petition denied.
DANAHY, A.C.J., and LEHAN and THREADGILL, JJ., concur.
NOTES
[1] This order of revocation appears to have been modified following a motion from Maxwell's attorney in Pinellas County. That motion mentions counsel's difficulty in finding appropriate placement for Maxwell. The probable effect of the original revocation order would have been to return Maxwell to Chattahoochee, although most experts were in agreement that that facility had provided inadequate treatment during Maxwell's prior confinement there.
[2] HRS also filed a direct appeal from this order. We have, however, elected to consolidate the three filings and to treat them as a petition for extraordinary writ.
[3] Maxwell has filed a "suggestion of mootness," pointing out that Medfield discharged Maxwell in December, 1991, requiring only outpatient treatment from that point onward, and that Medicare has paid at least some of Maxwell's bills. HRS denies that the cost question is the only, or even the primary, motivation for its petitions. Although we conclude that the petitions must be denied, we do agree that they should not be dismissed on grounds of mootness.
[4] Coincidentally, this is the same facility HRS prefers for Maxwell's further treatment.
[5] Ch. 85-167, Laws of Fla.
[6] HRS contends that the circuit court failed to take the necessary step of "recommitting" Maxwell. We disagree. A defendant committed under rule 3.218 may thereafter be "conditionally released," as was Maxwell. Fla.R.Crim.P. 3.219. However, such release may be revoked for noncompliance with the conditions of release or the deterioration of the patient. Fla. R.Crim.P. 3.219(b). The logical result of such revocation is the recommitment of the patient. In other words, Maxwell was functionally "recommitted" by Judge Starnes's order revoking the 1987 conditional release.